May it please the court. Good morning. My name is Michael Kim from the firm of Cobre and Kim and I represent the appellant Michael Coscia although I did not represent him at trial. I wanted to present the court with what I believe are two important questions of statutory construction that I believe will aid the court in assessing the spoofing count. I think the first important statutory question is whether Congress intended the parenthetical in the spoofing provision to define spoofing and this receives some treatment in the briefs but I wanted to expand upon it for a few minutes. May I start you off with a question please Mr. Chairman. Yes your honor. As the government says that whatever at the core of what is prohibited by the statute. If that is not correct in your view what is the core conduct that the anti-spoofing statute is is is meant to Yes your honor. I have a two-part answer to that. First your honor I believe it is actually impossible to tell what Congress was trying to prohibit and second I have a guess as to if they had written the statute more clearly what they were trying to prohibit and my two statutory construction questions actually will address precisely the points that your honor just raised. First what is it is it possible to tell what Congress prohibited? I believe on the face of the As your honors know the statute says what is a criminal offense is spoofing in quotation marks with followed by a parenthetical without quotation marks that says bidding or offering with intent to cancel before execution. Now the Congress had used this precise language word-for-word even including the quotation marks in the same provision 7 USC 6 C in the wash sale provision and there when Congress used the word wash sale in quotation marks Congress was referring in fact as the legislative history shows to a commonly defined industry term and they did not define it in the Commodities Exchange Act itself. Now Congress uses not just the same quotation marks but literally the same wording changing the word wash trade for spoofing in the spoofing So I believe that on the face of it it's clear to me that Congress was trying to define spoofing the same way they had defined wash trade by reference to an industry definition but of course to your honors of question Congress was mistaken there was in fact no common industry definition as evidenced by the CFTC the Futures Industry Association and every other major futures industry organization that debated the meaning of this provision after it passed and so not only do we have a situation where literally they did the same thing in the wash trade provision and attempted to reference a industry definition that didn't exist which is why I submit to the court it is impossible to tell what Congress was prohibiting but also we have the even greater puzzle of if there if the parenthetical was intended to be a definition why Congress would use quotation marks in the first place and I submit it's clear in the face of it the parenthetical is not intended to be a definition because your honors know from the same provisions in the Commodities Exchange Act definitions are used throughout and they are in a definition section or they are in phraseology that says such-and-such a word defined as. The Act does not use parentheticals next to quoted words as definitions and this makes sense because as evidenced by undisputed trial testimony and this goes to Judge Mannion's Judge Rovner's question about prohibited versus not prohibited conduct. It is undisputed that a great vast number of what are called conditional cancellation orders were considered legitimate and are considered legitimate are going on every single day. Are they going on with this sophisticated I guess it certainly is when I look at it this it looks like two computer algorithms that's the right word challenging each other in milliseconds. That's correct Judge. Do you think this law is targeted at that unique method or is it broader than that? Well if I had to guess your honor I believe it is targeted at conduct that problem in the really the year leading up to the enactment of this provision where people would put in bids or offers that could not be executed before the open and then would cancel them right before the open. The CFTC brought a number of enforcement for provision cases that we cited in our brief but was hampered by the fact that the then existing law required them to show an effect on price which was complicated and I believe that's if we had to guess what they were trying to target I believe that's what they were trying to target. You mean before the official opening of the market at a given hour or minute? Correct your honor. But there's so much that goes on internationally in the meantime I assume that does affect the market. Yes but in terms of the relevant markets that are operating under the jurisdiction of the CFTC they're only open at certain times for US working hours. And you think that's what it was directed at? Yes your honor. Before that opening they would put out bids and then cancel them when it opened. Yes your honor and there are a number of enforcement cases at the time that led up to the enactment of this provision where this was a hot issue. Now as your honor knows from the trial evidence it is undisputed that any open bid or offer can be executed within one millisecond. That's one one thousandth of a second and that any bid or offer exposed to the marketplace cannot be assured to be canceled without being executed. Now if one literally... Is there any way Kashia would concede that his trading was different than that of his fellow traders? Yes your honor. There were different in a number of ways but not in any way that would give rise to any fair notice that it was prohibited. In other words the government would at any given time say well he had the greatest volume sometimes that was accurate sometimes that was inaccurate. Sometimes they say that he canceled more often than others. Now as it turned out that actually was an inaccurate claim but even if it were what I would submit is that for conduct to be prohibited it actually has to be noticed in the first place. And I think the problem here is that the mere phrase bidding or offering with the intent to cancel before execution. Actually if you took it literally criminalizes every type of bid or offer put out where the person hopes that it doesn't get executed and gets canceled. And as the trial evidence shows there are a number of legitimate ways of doing it that would have been criminalized by this provision which defies common sense. For example as the trial evidence shows it is quite common and considered legitimate by the CFTC and apparently the DOJ on appeal to put out a bid or offer saying this will cancel if not executed in 100 milliseconds, 200 milliseconds, 1 millisecond. That's not prohibited. It is common for people to put things out, put out bids or offers hoping desperately that it does not get executed. For example the trial evidence speaks of stop-loss orders. Orders put out to execute only if the price of the order is higher than the number of milliseconds. Otherwise the order is not executed. Aren't stop-loss orders and fill-or-kill orders different with those orders? The trader intends to fill the orders under specific circumstances. But I am trying to understand under what circumstances Mr. Kashia's algorithm would fill large orders. Your Honor, I believe there actually is no distinction that can be principled because first of all with respect to Mr. Kashia's trading, the trial evidence is undisputed. He left his orders out, his large orders out for 250 to 400 milliseconds. Trial evidence was also clear that executions can occur in as fast as 1 millisecond. And that I believe an expert testified even leaving a bid or offer involves a substantial risk of execution. So in both Mr. Kashia's orders and a stop-loss order, you have an order out that is long enough for it to be executed. And in both the stop-loss order, in the stop-loss order the person is desperately hoping that it gets canceled before being executed because by definition if it's triggered, the market has moved against the person. The person is hoping the market does not move in that direction. So the person in the stop-loss order is desperately hoping, I hope the market never turns for this thing to be executed and I hope it is canceled of its own time limitation, which again can be 1 millisecond, 100 milliseconds or whatever the person puts on it. What Mr. Kashia did is simply another form of conditional cancellation. In other words, he put out fully executable orders that were programmed to cancel upon the occurrence of certain conditions, either the execution of which it is undisputed is legitimate or the occurrence of other bids or offers or other executions in the marketplace on his own positions. Well, Mr. Kim, the thing that bothers me about this whole thing, and I admit this is way over my head, it just seems that when you talk about they hope in a matter of time, there is no time. We're dealing with milliseconds. So it has to be one computer reacting to another. And is this unique in the market or is there a lot of this going on where in the old days a stop-loss order meant that if a stock gets down below a certain amount, it's a fail-safe. Yeah, you hope it doesn't get sold at a loss, but you're going to stop it before it loses more. But that's in simple terms and what we talk about in normal time periods, which we're talking about milliseconds. Correct, Your Honor. And no one can react manually in that period of time. That has to be another computer or set of computers. And the question is, is the market have evolved to this point where it is a market situation where you got a better computer than the other guy? With respect, Your Honor, I believe Your Honor is incorrect. Mr. Kosha's bids or offers were hit by human traders within 250 to 400 milliseconds thousands of times. And that's what the undisputed trial evidence shows. And while it's not cited in the briefs, the CFTC itself has published papers showing human beings can react and trade in milliseconds. So the commodity futures markets, the trial evidence shows, operate fundamentally differently in that stop-loss orders and all bids and offers are out there for very short amounts of time. The trial evidence shows that 80% of all bids and offers are canceled before execution and more than half of those in under one second. And that the prices and commodity futures markets often change hundreds of times within the span of one second. And that's not... Mr. Kamp, forgive me, but how should we interpret Mr. Kosha's conversations with Jeremiah Park that the large quote orders were to act quote like a decoy or be quote used to pump the market, quote, or were quote sizable orders used to move the market? How do we deal with all of that? Yes, Your Honor. As a matter of fact, I believe the word decoy was not used by another witness to describe an innocuous type of trading called a ping order, a tiny order put out to the marketplace to see if somebody would execute it. But in any event, I believe that it is not necessary for the court to interpret any of those statements. I am not here quibbling with the factual inference that the jury apparently drew, that Mr. Kosha had a hope that his bids or offers would be canceled before execution. I am here arguing about the lack of legal significance of one harboring that hope because where the parenthetical talks about the intent to cancel, I submit this court should interpret the word intent to not include situations where a person has merely a hope or expectation of cancellation because to do so would expose everyone to the risk of rampant arbitrary enforcement. And that is because anybody who puts out a conditional cancellation order has a hope, if it's a type of order where they don't want the market conditions to move that way, has a hope that it's not executed. Two examples of the types of conditional cancellation orders where people have a hope or expectation of that it will be canceled, that the government and the CFTC regard as completely legitimate. First, we Well, but of course here what the government maintains is that Kosha's intention was to make small orders that were intended to be executed and simultaneously he was manipulating the market with large orders that he intended to use only to manipulate but not to fulfill. Your Honor, that was a rhetoric to the jury, but Kosha was not charged with manipulation. And as the recent case of Stone Fort Holdings down below shows, it is a common market practice for people to put orders or bids or offers on opposite sides of the marketplace. And so the conduct that Kosha has engaged in, which the DOJ regards as suspicious, was never prohibited and never publicized as being prohibited. And so they are torturing the phrase intent to cancel before execution to include all instances where somebody has a hope that it does not execute when, in fact, there are it's undisputed a number of types of orders that people will put out where people have a hope that it is not executed, not just the stop limitation or stop loss orders, but types of ping orders or fill or kill orders where people are hoping that only a tiny gets executed or the rest are not executed. And, Your Honors, I think the problem here is if you're going to convict somebody of a crime and put them in jail, the prohibition of what conduct is prohibited and what is not has to be clear. And we have a situation where the government on appeal has admitted that there are a vast number of conditional cancellation orders, orders where people, when they place them, hope are canceled before execution that are legitimate. Is there any legislative history that indicates that Congress expected the CFTC to come out with regulations further refining the contours of the statute before criminal prosecutions were brought? No. There is no legislative history whatsoever about this provision. And, in fact, as Your Honor knows from the briefing, the CFTC did not define spoofing as what's in the parenthetical, unlike what the DOJ's appellate counsel wishes the court to do. And at the time of Koshia's actions, the CFTC had not provided any interpretation as to what types of conditional cancellation orders are prohibited and what types are legitimate. I will spend, I know I'm in my rebuttal time, but I will spend just one minute on the commodity futures accounts. The core allegation of the government is that Mr. Koshia misled the marketplace as to how long his bids or offers would be in place. But as the trial transcript shows at 676, 720, and 769, it is undisputed that nobody in the marketplace has any expectation as to how long anybody else's orders will be in place before they're canceled. And the second type of fraud, they are. Is it your position that the discrepancy in cancellation rates between large and small orders is common or routine? Is that your position? My position is it's irrelevant because the outlier theory of criminalizing conduct, criminalizing conduct that is legitimate by saying you have engaged in it more often than other people or you have engaged in it in greater volume than other people, is I believe a significant problem from both an arbitrary enforcement and a fair notice perspective. There was no prohibition at the time on how often or how extreme or in whatever manner one trades. Now, Your Honor, those are factual disputes that I think later were backed off at sentencing as to the government's statistical information, how accurate it was. But as a matter of law, Your Honor, I don't believe the court can say, well, if you're the largest trader or if you did something so often, it's criminal because nobody really has come out and said so except in the arguments of the government. It's the ex post facto decision as to what factors are considered suspicious that I think the government is trying to impose on what was a vague set of standards that even the CFTC and the industry agreed were vague. If Your Honors have any other questions, I'll address them. Otherwise, I will reserve one minute for rebuttal. Thank you, Mr. Kim. We'll hear now from the government, Ms. Kostanek. Ms. Kostanek, I'm going to give you an extra four minutes because I'm anticipating giving Mr. Kim an extra four minutes for rebuttal. Thank you, Your Honor. May it please the court, Andriana Kostanek on behalf of the United States. The anti-spoofing provision of the Commodities Exchange Act is not unconstitutionally vague as applied to the defendant. It contains a definition of spoofing. It requires action, the bidding or offering in the marketplace, and it requires specific intent at the time that somebody placed that bid or offer that he intended to cancel it. He did not intend to execute it. It's premeditation. Okay, what is a legitimate reason to cancel an order? Why are more than 90% of commodities orders canceled within milliseconds of being placed? A legitimate reason to cancel would be anything that occurs after that order is placed. So a very common reason to cancel is that you place an order in the market and you realize based on market events, whether pricing or liquidity information in the market, that that order was ill-conceived. The definition of spoofing in the statute excludes that. It excludes good-faith orders. It excludes reckless orders. It excludes orders that market conditions show will not be profitable. That accounts for a vast majority of the cancellations that occur in the market. That does not define or it does not describe what the defendant's conduct was in this case, according to the jury. The jury was provided. Okay. So Ms. Ms. Forgive me. There's a little delay, you see, and sometimes I anyway. Mr. Kashia's algorithm canceled larger orders, as I see it, under three conditions. First, if a smaller order was executed. Second, if they were partially filled. And third, if they were on the market for 100 to 100, I'm sorry, for 100 to 450 milliseconds. Is any one of these conditions more problematic than the others? Which is the behavior that is really the problem? And I'll just take issue with one issue of phraseology in the question, which is that the defendant characterizes these as conditions under which he canceled. That is not what these are. These are the parameters under which the cancellations occur, and that's an important distinction because conditions suggest an after-the-fact event, something like a market change. Orders can be programmed to cancel if the price goes down. That's the stop-loss orders that the defendant refers to. Orders can be programmed to cancel in the context of fill or kill. They want a particular quantity filled or nothing at all. Those are after-the-fact events that occur. What the defendant's parameters of his algorithm provided were that he wanted these large orders to be canceled in all situations. So how he did this is he used his large orders and his small orders in a fraudulent manner, in a strategic manner. He programmed those large orders to be canceled as soon as the small order filled. So he wanted that small order to be filled as a result of the pressure, the buying pressure, the selling pressure that those large orders provided. He also had as a parameter of his cancellation that those large orders would fill if even a single contract got filled. So if he had a 200-lot order and a single contract was hit, the rest of the order completely went away. And then the third parameter was if no activity happened in the specified timeframe, that order was canceled. All the orders, large and small, were canceled, which is just that kind of stop-gap measure if nothing was happening in the market. But those first two parameters are very important because it shows that by their very design, these orders, the defendant did not want them to exist in the market. He wanted to use them to shift supply and demand in a way that brought the market down to the price or up to the price at which that small order had been placed. And that's important. That's the core conduct the spoofing statute prohibits. And I want to turn to the defendant's argument that this is not a definition in the statute, an argument that really cannot be squared with the statutory text. So the text says spoofing. It provides the word spoofing in quotes, and it contains 14 words in a parenthetical. There are two options here if the court is not going to entirely read those words out of the statute, which it cannot do. It's either a definition, which is how it reads because it does not contain an EG or an including or an IE prior to it, or it's an example. And remember that the defendant has only pursued his challenge, his vagueness challenge, on appeal as an as-applied challenge. So even if this is an illustration of conduct that is prohibited, that means that the defendant had fair notice. This is the example of conduct that Congress said was illegal. They provided fair notice that the same conduct that the defendant was convicted or prosecuted and convicted for is the conduct that is prohibited by the statute. The defense counsel says that this is like the wash sales provision. I fail to understand the significance of that. The statute in a separate provision under 6C prohibits wash sales and accommodation trades. It provides both of those words in quotation marks but does not provide a definition. Even if there was some similarity in the use of quotation marks, the spoofing provision does provide a definition. It goes farther than those earlier provisions where it uses the term wash sale. It provides a definition of spoofing. I want to take you a little somewhere else for a minute. You see, in some way it seems like all of these computer algorithms are just trying to outsmart each other and making the quickest and most accurate calculations so that they can buy low and then sell high. Is it fundamentally different to have a computer program that figures out the market in a new way? Couldn't other traders adapt their computer algorithms to this new method? In other words, are we punishing this defendant for being the first to build a better mousetrap? It is not illegal to adapt computer algorithms to be effective. It is not illegal to respond to other traders' activities. It is not illegal to buy low and sell high. Those are market activities. The significant difference is that the defendant's conduct was deceptive. It was fraudulent. He placed his orders without intent to execute them. For example, the defendant repeatedly refers to the statistic in his brief that he filled 8,000 large orders. Somehow that indicates that he did not intend to cancel those large orders. That figure is a misnomer. The actual number of large orders that he fully filled during his scheme was 260. The statistic is that he filled 0.08% of his large orders out of about three-quarters of a million orders that he placed during the scheme. This is significant because it shows that although his large orders could have been there legitimately, he was doing everything he could to ensure that they were not executed. This goes back to your question, Judge Rovner, because the significance of that is that other traders at trial testified that supply and demand is very, very important. In commodities markets, there actually is nothing more important than supply and demand. That's how prices are determined. Where the market is determines how people trade that market. And traders are entitled to rely on supply and demand information being accurate. That other people, when they're placing their orders, are doing so in good faith. That they intend to actually keep that order on the market long enough for it to have the possibility of being executed. The defendant's statistics regarding his actual trading and the data that shows that he executed only 0.8% of his large orders indicate that he had no intent to execute these large orders. He was using it to artificially depress or impress or increase market prices so that he could fill those small orders. And that's what was deceptive. That's what was fraudulent. And that's what demonstrates that at the time he placed those orders, he intended to cancel them. What you're saying is he artificially distorted one side, supply, and the other side, demand. Exactly. Yeah, and the thing that bothers me about all of that, it's done in such a short period of time. And as Judge Rover mentioned, it's one algorithm against another. And this is the first time this has been prosecuted, is that correct? There have been subsequent cases brought by the CFTC. This is the first criminal prosecution under the spoofing statute. Does this mean this is one-of-a-kind? Nobody else out there is doing anything like this? I do not think that that is a fair characterization, Your Honor. It's what? I do not think that that's a fair characterization. The CFTC has brought at least one. What, saying it's one-of-a-kind? I'm sorry? What's not a fair characterization? I don't think that it's necessarily one-of-a-kind. There is other activity on the market that has been prosecuted that's like this. However, the statistics show that during the time frame that he was operating the scheme, it was one-of-a-kind insofar as he's the only person that was attempting to manipulate the markets like this. You are correct. Electronic trading happens very quickly. Things happen in a fourth of a second that, you know, that's as fast as about you blink your eye. But the algorithms are specifically programmed to adapt to that fast movement. And the traders who testified at trial, and this goes to some of their materiality arguments that they raised in their reply brief and in their opening brief, is those algorithms were specifically programmed to trade based on imbalances that they perceived in supply and demand. So, for example, what the defendant was doing is if corn was at $3, let's say, using those numbers out of the box here. So let's say corn's at $3. He wants to buy it low. So he puts in a small trade order for $2. But he needs to make sure that the price, because nobody is willing to fill it at $2, comes down to 2. And the way that he does that is he flips to the other side of the market. He puts in a series of sell orders starting high, so 5, 4, 3, and he becomes the whole market, right? Because his large orders are so big that he is the vast majority of that market. And the effect of that is that the other algorithms see an imbalance of supply and demand. Lots of liquidity for that moment in time because those contracts are so big, the orders are so big, and then they're progressively decreasing towards where his small order sits. And the effect of that is that it perceives a depression in prices. And somebody goes and fills that small order that's sitting at 2, even though the market price had been 3. He then cancels those large orders, and he flips to the other side of the market, does exactly the same thing, turns around and sells it for 3, with the repeat of the process exactly the opposite. All of this happens very quickly, but that's a great example of how the effect on supply and demand deceives these other traders who are trading through their algorithms. And the defendant makes a big deal in his reply brief about how, you know, deception of algorithms isn't the same thing as deceiving traders, and that is such an artificial distinction. It's like saying that my voice is talking, but I'm not. The traders are trading through these algorithms. They're programmed in a particular way to assess supply and demand, and the defendant manipulated that supply and demand as relevant to the context. Does every trader have the capacity and right to choose his or her own algorithm? Yes, Your Honor. I think the evidence shows that traders like the defendant develop these algorithms using computer programmers, using their own sometimes proprietary software, and they're all always, and the traders have testified that what's very, very important to those algorithms is supply and demand. And so that's why, even though, yes, there's no minimum amount of time that orders need to be on the market, that's true, the defendant's conduct went way beyond that. He wasn't just canceling orders quickly. He was using those orders in a way that manipulated that supply and demand. And the defendant, as he did in the district court, repeatedly argues, you know, he wasn't charged with price manipulation, and that's true. But the conduct in substance is the manipulation of supply and demand, which determines prices. Yeah, but this is clearly a game, really. You know, the farmer. The farmer in June thinks he's going to have a great crop, and so he makes a contract for sale at a certain level for October. And in the meantime, all this zigzag back and forth, it's not dealing with corn. It's dealing with the contract, and the supply depends on whether it rains or not. And this is the thing that bothers me about this whole thing, is we're dealing with such a high sophistication, as Judge Romer said, when doesn't the other guy just come up with a better algorithm and catch this guy when he doesn't want it sold and he'd get it anyway? I mean, in other words, you intercept his scheme within a millisecond. And I accept what Mr. Kim said about you can physically do this quicker than the algorithm, and I guess if they've got quick hands, okay, but this baffles me. That's why I'm asking a question, and this is the first criminal prosecution. Yes, Your Honor. And you say there may be others out there. Well, and just to be clear, it's the first criminal prosecution under the spoofing statute. It certainly is not the first criminal prosecution under 1348. Under what? 1348, which is the commodities fraud. No, spoofing. I'm talking about spoofing. Okay, it is the first prosecution under the spoofing statute. But a lot of these issues. Cass Stanek, it is not the only one. I think that's what Judge Mannion is trying to get to. It's not the only one. There is a civil case, a civil spoofing case, that's pending in the Northern District of Illinois in front of Judge St. Eve involving similar conduct. And there was already a civil case. I'm sorry? There was a civil case against Mr. Koshia. There was, Your Honor. The CFTC brought a civil case. He settled that case for $2.8 million. Does this statute make partial fill orders, stop loss orders, fill or kill, and hidden quantity orders illegal? I've had to learn a whole new language here. Yeah, there's a lot of terminology to learn. I think that we have to take each one of those separately because the answer differs for them. It makes none of those things illegal. But the reason why is different. So some of them fall into the category of being conditions that arise after the order is placed. And so the spoofing statute very clearly makes it only a crime to place an order with the intent at the time to cancel that order. And so that encompasses schemes like the defendant where he, by its very design, wanted those orders to not go through. He was using them for another purpose other than execution. So something like a stop loss order, which is I want the market to be at a particular price. But if it goes down, then I'm going to sell that security or that commodity at that price before it goes any lower. Well, that's an after-the-fact market event. It depends on particular market conditions. And, in fact, when it's placed, they don't want the market to move in that direction. They would like it to be filled at a higher price. They would like to trade at that higher price. And the same is true of fill or kill orders. What that is is where somebody says, I want my order filled, but I want 200 lots or I want 100 lots. I want a specific quantity of orders to be filled. And if I can't get that order filled, then I don't want anything. And in that situation, the trader does want that order filled, but they want it filled under particular conditions. And that's the big distinction between what the defendant was doing and what these legitimate traders are doing, is that by its very design, the defendant is acting to use his orders in a different way for a reason other than trading them. And to go to one of Your Honor's questions of the defense attorney, you asked about his conversations with Jeremiah Park, who was his computer programmer. And in an email to Jeremiah Park, the defendant described wanting to use his large orders as sizable orders to move the market. He described his large orders as being used to pump the market. And that's consistent with the admissions that he made at trial. He testified. It wasn't just a reasonable doubt defense in this case. He testified and he acknowledged that he was using those large orders to show strength in the market. But his claim in his testimony was, yes, I did this strategy in this manner, but I wanted to trade all my orders. Large and small, I wanted to trade them all. And he identified particular examples of large orders that were filled. And he said, look, I wanted to trade those. And that was disproven by the actual data that was introduced in the rebuttal, which showed that even as to the specific examples of large orders that he said that he wanted to trade, the error log showed that he was frantically trying to cancel his orders, but wasn't fast enough because it was happening in such a limited amount of time. Any trader that sees, you know, a disaster coming? Well, and, you know, none of this evidence, like, for example, standing alone, that may have more limited significance, but it was part of a slew of evidence at trial, every shred of which showed that he was using these large orders for a reason other than to trade them. It was his own testimony about his cancellations or wanting to fill those orders. It was the testimony of Jeremiah Park. It was market data showing that he was the only trader in the market who was canceling large orders after filling small orders. It was data, market data, showing that his cancellation rates for large and small orders were disparate. So he was canceling, just like other traders, 98 or 99 percent of those large orders, but not his small orders. He was canceling somewhere closer to 50 percent of those small orders and filling the rest of them, which shows that this isn't just like any normal trading. He was doing this in a manner to manipulate the market and using those orders for an intent other than to execute them. I do want to address briefly Judge Ripple's questions about legislative history in the CFTC. It is not correct that the CFTC has not defined spoofing. They have repeatedly affirmed that the definition that's in the statute is the definition of spoofing. So, for example, the defendant cites a December 2010 roundtable discussion by the CFTC, and if you look at the transcript of that roundtable discussion, the CFTC on page 6 of that transcript says, spoofing is defined as bidding or offering with the intent to cancel the bid or offer before execution. That's the definition that we're talking about here. That is the definition that gave the defendant fair notice. That definition is repeated in the May 2013 guidance that the CFTC issued that, of course, happened after the defendant's conduct, so it's hard to imagine how any ambiguity here would affect his fair notice. But nonetheless, in that interpretive guidance, they define spoofing as a person must intend to cancel a bid or offer before execution. That's the statutory definition, and they've reaffirmed it repeatedly. Other than that, what the CFTC has done is give guidance on its application of real-world conduct, and that's an appropriate thing for the CFTC to have done. They've specified the circumstances that they will look at in assessing whether conduct is criminal. That doesn't create some sort of ambiguity for the defendant. He still fits within the core conduct that is prohibited by that statute. We have talked a lot about both commodities fraud and the spoofing statute, so I want to just address very briefly the defendant's argument that somehow this cannot be commodities fraud because no one was misled. That is a misstatement of the law. It rests on an assumption that in a fraud prosecution that someone must actually be misled, and that is not what the law says. So the law requires a scheme to defraud with intent to defraud. It is possible that that scheme was not successful. No one needs to have actually been misled as long as it has the capability of influencing the audience to whom it's directed, and the defendant, in fact, proposed exactly that instruction in the district court. He proposed an instruction that comported with this circuit's pattern instruction on materiality for the 1300 fraud statute. So just like mail and wire fraud, in the context of commodities fraud, that action must be capable of influencing or have a natural tendency to influence its audience. The district court accepted that standard. The government agreed with that standard, and the evidence that was presented at trial showed that there was that natural tendency, and in fact, other traders were misled, and this goes back to the discussion of other traders' testimony about supply and demand being very, very important. There are algorithms responding to imbalances in the market, and all of that shows that not only was there a tendency to be misled, but they were misled, and for all those reasons, the government asked that the court affirm the defendant's conviction and sentence. Thank you. Yeah, but it seems that if somebody learns how to execute before the perpetrator, I guess, would have time to cancel, and about three or four times that happening, he's going to have big civil damages, right? He can't pay it. Well, if that had happened, if somebody had actually been fast enough to fill those large orders, it would mean that the defendant was losing a lot of money. Be what? It would mean that he was losing a lot of money on the market because... It doesn't take long to lose a lot of money to be out of business. That's correct, but the fact that they are subject to market risk doesn't mean that they're legitimate. All orders are subject to market risk. See, we've got a crime here, and I guess that's, you know, if you just go by the straight definition here, yeah, he's guilty, and that's what, nothing I can do about it. I just made an observation that somebody has figured out a way to avoid getting stung financially. Yes, sir. And if the other side of that ends up buying a small order, okay, whatever it is, I guess from a civil standpoint, big losses would eliminate this practice. It possibly would, and the only thing I'll close with is that that fact, the ability for those orders to be executed, does not make them not fraudulent. The defendant specifically used them in a manner to deceive other people. Thank you. Thank you, Ms. Kostanek. Mr. Kim, we gave Ms. Kostanek a few extra minutes, so you have six minutes now for rebuttal. Thank you, Your Honor. I appreciate the extra time. First of all, the CFTC interpretive guidance that counsel referred to actually was issued two years after the events here in question. So whatever that guidance contains was not available to Mr. Kosha. And, in fact, Mr. Kosha's conduct occurred. I'm sorry. I'm sorry. Forgive me. Could you repeat slowly what you just said? Yes. The CFTC interpretive guidance that counsel for the government just read to you about the CFTC's definition of spoofing occurred two years after the events in question here. So whatever that guidance said was not available to Mr. Kosha at the time of his actions. In fact, Mr. Kosha's actions occurred only a few weeks after the enactment of this cryptic provision with no guidance from the CFTC. And, in fact, our brief shows widespread disagreement in the industry about what it means. And I'll tell you why the industry was so confused about what that parenthetical was actually prohibiting. First, contrary to what counsel for the government told you, it is not illegal to trade large positions or to put out large bids or offers in an attempt to move the price. Two cases, United States v. Radley, cited in our brief, and CFTC v. DRW, issued out of the Southern District of New York recently, make clear that illegality only happens if you are trying to create an artificial price. And as Radley teaches, you have to do something other than putting out bids or offers into the regular marketplace. You have to do something outside the marketplace. You have to tell a lie. Something else has to occur because obviously — Mr. Kim, could you help me with this? Help me with my scenario. Yes. Ms. Koshia created an entirely new way to manipulate the market. Am I wrong there that he created a new way? Yes. Yes, you're wrong because there was actually no evidence that he moved any prices and that the word manipulation under the law is defined as something other than operating within the marketplace. So I think it would be more accurate to say he created an algorithm that traded in a way that was unanticipated by other traders and other computers. Okay, well, that's an entirely new way to deal with — I use the word manipulate, but to deal with the market. A new way to trade. The statute specifically requires that a defendant offered orders that the defendant intended to cancel before execution, right? Yes. How did his behavior not meet this definition? Because he had only at most a hope or expectation of cancellation. And here is where I think, again, we have other misinformation on this public record. The notion of putting out a bidder offer that's timed purely to cancel after a certain passage of time, not based on new information discovered, not based on you looked at the screen after you put the bidder offer out and changed your mind, but at that time the bidder offer is put out. The computer program is programmed to automatically cancel that order within a certain number of milliseconds. It is completely lawful. There is no prohibition against it. You can program it to cancel in one millisecond. And as our brief shows, some 65 percent of all trading in the commodity futures markets are done by computers, not human beings. And that is why prices change thousands of times per second. And so therefore, Judge, the notion that when somebody puts out a bidder offer and programs it to cancel, let's say within 10 milliseconds, that person obviously has, and that is a completely lawful order, that person may have a hope that it's not executed, a subjective hope, or maybe they desperately want it to be executed but they have an expectation it won't be executed. None of those are criminal. And yet we have the government here arguing where Mr. Kosha, who put his orders out for 250 to 400 milliseconds, much longer than the trial evidence shows could have been executed by anyone, is being labeled a criminal and sent to jail because of the argument that the trading pattern he was engaged in somehow showed that he deceived other people. And yet the trial evidence is also undisputed. There's no duration anybody has to keep orders on. There's no assumption anybody makes about the true extent of supplier demand. It is completely lawful to hide the true nature of one's demand by things called iceberg orders. They're orders meant to hide what you really want to buy. So it may be completely legitimate. If this court writes an opinion that says anybody who engages in this type of trading, even though it's completely lawful and always was and is, to program orders to automatically cancel within a certain number of milliseconds, even though that's the case, that's one of Mr. Kosha's conditions. The second condition being even though it's lawful to program your pre-program your order to cancel if it's even partially hit. Now, as I mentioned before, I am aware that there are other, well, other civil cases out there. But are there any other criminal cases that you're aware of? There's one other criminal case where there was a guilty plea. But there is no criminal case where somebody actually has gone to trial over this. And the fact is, Your Honor, of the three conditions, the timing, it's totally lawful. There's no guidance that you can't cancel. You can't program your orders to cancel within a certain time. It's completely lawful, the second condition, to program your order to automatically cancel if somebody hits even a part of it, which is the second condition. And the third condition being it's totally lawful, again, to program your order to automatically cancel on its own if something else occurs in the marketplace, such as somebody hits another of your positions. So because each of Kosha's conditions were undeniably lawful, and yet the government is now saying the combination of all three and this particular pattern of behavior was illegal, I submit Kosha had no fair notice. A few weeks after this vague statute was passed, and yet with no guidance from the CFTC, when he preprograms his algorithm, just like 65% of all other market activity out there, on three conditions, each of which is independently lawful, for this court to have him convicted of a crime and imprisoned because there's the opinion of the Department of Justice that this somehow shows some type of deception which they cannot articulate because there is no assumption, the trial evidence is undisputed, that any market participant makes any assumption of the duration of other people's orders or their true extent of supply or demand or even their motivations for trading. So it may be that if this court issues an opinion that says if you have these three conditions in your computer algorithm, it is a crime, whoever does it tomorrow certainly would be on fair notice that even though each of these conditions is lawful, the person should be convicted. However, Mr. Kosha back in 2011, with simply this bare provision filled with ambiguity, with a parenthetical that arguably, if you read it literally and non-common sensically, encompassed every type of conditional order out there, every type of preprogrammed computer order that was set to cancel within certain milliseconds or upon the occurrence of certain conditions, that he should have known that years later some Department of Justice employee would have a personal opinion that the combination of three types of lawful conduct would be a crime I think is unconstitutional and that if you're going to take what are individually lawful pieces of conduct and say in the aggregate it is a crime, then that, I submit, Your Honors, is something that has to be clearly publicized so that people can conform their behavior to it. And I would say this is not unlike, even though it's a different context, this Court's decision in the case of Recordhead where there the Court was examining a city ordinance that said it's a crime to display an instrument that encourages the consumption of illegal drugs. And the ordinance failed to define what the instrument was. And the ordinance said, well, you can tell what the instrument is by the intent of the person displaying it. If the intent of the person displaying it was to encourage the consumption of illegal drugs. And the Court held that that encouraged arbitrary enforcement and was unconstitutional because it allowed too much discretion in the hands of the executive branch to define what the crime was. And we have, I submit, precisely the same situation here today. If different constellations of lawful conduct could be a crime, that has to be announced in advance. Thank you, sir. Thank you, Your Honor. Our thanks to both counsels for both excellent briefs and excellent oral argument. And the case will be taken under advisement.